FILED
RICHARD W. HAGEL
CLERK OF COURT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

2016 JAN -6  PM 12: 54

U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

| | |
|---|---|
| IN THE MATTER OF THE USE OF A CELL-SITE SIMULATOR TO IDENTITY THE CELLULAR DEVICE CARRIED BY BRIAN ROBINSON | Case No.  1:16MJ-009<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Christopher M. Giordano, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique further described in Attachment B, in order to identify the cellular device or devices carried by BRIAN ROBINSON (the "Target Cellular Device"), described in Attachment A.

2. I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since February 2010. I have conducted investigations into criminal enterprises, narcotics investigations, organized crime, and violent crimes to include the unlawful possession, possession with the intent to distribute, and actual distribution of controlled substances, as well as the associated conspiracies in violation of Title 21, United States Code, Sections 841(a)(1) and 846. Your affiant has also participated in the execution of federal search warrants and federal arrest warrants in relation to these investigations.  Additionally, your affiant has participated in the installation and monitoring of tracking devices for vehicles in order to determine the whereabouts of believed drug traffickers and their illicit merchandise.  Your affiant has also been involved with the administrative duties and monitoring responsibilities of Title III Wire intercepts, and analysis of pen registers related to narcotics and gang investigations. Your affiant

is familiar with their methods of concealing the whereabouts of their illegal drugs, the methods they use to keep law enforcement officers from finding evidence of drug trafficking operations as well as the methods they use to prevent others unfamiliar with their criminal conduct from observing things indicative of drug trafficking. Your affiant is also familiar with the paranoia surrounding most drug traffickers and the common ways in which wholesale drug distributors attempt to conceal their assets, their purchases, and other financial dealings that could be traced to them.

3. Prior to employment with the Federal Bureau of Investigation I was Police Officer in New Jersey from June 2005 until February 2010. During this time I investigated all violations of state and local statute to include but not limited to homicide, narcotics trafficking, aggravated assaults and investigation into local street gangs. Your affiant has also participated in the execution of state search warrants and state arrest warrants in relation to these investigations.

4. During the course of my law enforcement career I have conducted and participated in the investigation of numerous criminal offenses, including those involved in the current investigation. I have participated in over 30 illicit drug trafficking investigations, violent crimes investigations, and gangs and criminal enterprise investigations, ranging from street level dealers to major drug suppliers. Gang and criminal enterprise investigations have included three outlaw motorcycle gang investigations, and three violent street gangs operating in South West Ohio. These investigations have also included the unlawful importation, possession with intent to distribute and distribution of illegal substances, the related money laundering instruments, the conducting of monetary transactions involving the proceeds of specified unlawful activities, and conspiracies associated with criminal narcotics offenses. These investigations during my career, which have resulted in the seizure of narcotics, arrests of suspects, their prosecution, conviction; have involved: the use of confidential informants; the analysis of pen registers, trap and trace,

and toll records; physical surveillances; electronic surveillances to include the use of poll cameras and vehicle cameras; and the execution of search warrants. I have also been the affiant on several search warrant affidavits over the past year involving this current investigation, have testified in grand jury proceedings; and have written reports and analyzed documents in the course of investigations.

5. Through my training and experience I am aware that drug traffickers often communicate with their customers, couriers, and/or associates through the use of standard hard-line telephones, cellular telephones and digital display paging devices, or use of multiple telephones or other devices, to avoid detection by law enforcement.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. This Court has authority to issue the requested warrant under Federal Rule of Criminal Procedure Rule 41(b)(1) & (2) because the Target Cellular Device is currently believed to be located inside this district. Pursuant to Rule 41(b)(2), law enforcement may use the technique described in Attachment B outside the district provided the device is within the district when the warrant is issued.

8. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 United States Code, Sections 841(a)(1) and 846 have been committed, are being committed, and will be committed by BRIAN ROBINSON. There is also probable cause to believe that the identity of the Target Cellular Device will constitute evidence of those criminal violations. In addition, in order to obtain additional evidence relating to the Target Cellular Device, its user, and the criminal violations under investigation, law enforcement must

3

first identify the Target Cellular Device. There is probable cause to believe that the use of the investigative technique described by the warrant will result in officers learning that identifying information.

9. Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. See 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. See 18 U.S.C. § 3123(b)(1).

## PROBABLE CAUSE

10. Since August 2011, the Cincinnati Police Department ("CPD"), along with the Federal Bureau of Investigation Cincinnati Division ("FBI"), the Drug Enforcement Administration Resident Agency ("DEA") and the Bureau of Alcohol, Tobacco, and Firearm Cincinnati Resident Agency ("ATF") have conducted an investigation into the heroin trafficking activities of the SHADY MIST STREET GANG ("SMSG") led by CLIFFORD REED ("CR"), JEFFREY REED ("JR"), QUENTIN HEARD ("QH"), and others. The SMSG has been operating throughout the city of Cincinnati and is believed to have close ties with the Black Gangster Disciples Street Gang operating in Chicago, Illinois, which serves as a main source of supply to the SMSG. While the investigation in SMSG had been extensive, in December 2014, DEA and CPD ceased all investigative activity and turned investigative responsibilities over to FBI.

11. On September 28, 2015, Title III electronic and wire interceptions were authorized by the Honorable Susan J. Dlott, U.S. District Court Judge for the Southern District of Ohio, with regard to communications taking place on cellular phone (513)501-6635, utilized by QH. Since the initial interceptions, agents have identified several individuals involved with

4

narcotics trafficking and have intercepted numerous narcotics-related communications taking place on (513)501-6635.

12. On December 2, 2015, agents from the Southern Ohio Safe Streets Task Force conducted surveillance on JR in conjunction with a controlled narcotics purchase. Confidential Human Source 1 (hereinafter CHS 1), has been working for the FBI for several months and has thus far provided reliable information. CHS 1 has a criminal history to include several narcotics violations and is currently providing information to the FBI for case consideration in an unrelated matter. CHS 1's reliability has been determined by the FBI based on CHS 1's previous, reliable information reporting on narcotics and violent crimes, including information provided to the FBI from CHS 1 later corroborated (e.g., target cellular numbers, vehicles driven by targets), and more recently by CHS 1's ability to conduct three controlled narcotics transactions involving JR and co-conspirator QH. Information provided by CHS 1 regarding subjects, vehicles driven by subjects, and phone numbers of subjects have all been corroborated through, e.g., toll analysis of phones, surveillance of subjects at specific locations, or physical observations of subjects at certain residence and or in specific vehicles.

13. On December 2, 2015, at approximately 1:35 p.m., CHS 1 made a recorded phone call to JR, who was utilizing cellular number (630)456-0760. At that time, CHS 1 requested to meet with JR to purchase narcotics, in which JR informed CHS 1 to go to "the spot." CHS 1 informed agents that "the spot" was a residence located at 3973 Lowry Avenue, Cincinnati, Ohio. At approximately 1:40 p.m., CHS 1 was searched for contraband, given a recording device and approximately $1,750.00 in U.S. currency and instructed to meet JR at the residence on Lowry Avenue to purchase approximately one half ounce of heroin. Agents maintained physical surveillance of CHS 1 the entire time and followed CHS 1 to the aforementioned residence. Upon arriving at the residence, agents observed a newer model black Nissan Maxima,

5

being driven by JR, park behind CHS 1, exit the vehicle, and go into the residence at 3973 Lowry Avenue empty handed. While maintaining surveillance of CHS 1, a black Lincoln Navigator bearing Florida registration BQAK15 arrived at the location driven by DEVONTE WALKER (hereinafter DW). Approximately three minutes later, JR walked from the residence holding what appeared to be a clear plastic baggie in his hands, placed the baggie on the seat of CHS 1's vehicle and took the $1,750.00 from CHS 1. Upon completion of the meeting between CHS 1 and JR, Agents followed CHS 1 to a predetermined meeting location and retrieved the suspected heroin from CHS 1 that was purchased from JR. A field test of the substance tested positive for opiates and weighed approximately 14 grams.

14. On January 4, 2015, affiant met with Confidential Human Source 2 (hereinafter "CHS 2") who provided intelligence on members of this criminal organization. CHS 2 has worked for the FBI Cincinnati for over a year and has a criminal history to include narcotics trafficking. CHS 2's reliability has been determined by the FBI CI based on CHS 2's previous, reliable information reporting on narcotics and violent crimes, including information provided to the FBI from CHS 2 later corroborated (e.g., target cellular numbers, vehicles driven by targets). Information provided by CHS 2 regarding subjects, vehicles driven by subjects, and phone numbers of subjects have all been corroborated through, e.g., toll analysis of phones, surveillance of subjects at specific locations, or physical observations of subjects at certain residence and or in specific vehicles.

15. CHS 2 was shown photographs of CR; JR; DW; QH; WENDELL REED (hereinafter "WR"); DORIAN CHILDS (hereinafter "DC"); LARICO JOHNSON (hereinafter "LJ"); JOHN MOORE (hereinafter "JM"); ERIC CARR (hereinafter "EC"); CHRISTOPHER CARSON (hereinafter "CC"); VALDEZ HARRIS (hereinafter "VH"); and other known only by street names and not yet positively identified. CHS 2 informed agents that CR is "the man" and

main source of supply of heroin throughout the Cincinnati, Ohio area. CHS 2 stated the CR is very careful with his dealings, does not sell heroin unless it is over a one kilogram transaction, and only deals with individuals he trusts. According to CHS 2, CR supplies multiple kilograms of heroin to JR, CC, and LJ who in turn sell smaller multi-ounce quantities to lower level narcotics traffickers. CHS 2 stated that CC, JR, and LJ run their own criminal enterprises and do not work together. CHS 2 stated that JR is a boss over a narcotics distribution cell consisting of EC, DC, QH, and DW. CHS 2 was unaware of the official names of the individuals within the narcotics distribution cells being run by LJ and CC. CHS 2 identified an individual BRIAN ROBINSON (hereinafter "BR") and provided a cellular number for BR as (513)903-8743, (hereinafter TT#1). CHS 2 stated that BR buys quarter kilogram quantifies of heroin from both JR and CR utilizing TT#1 as well as other unidentified numbers CHS 2 has yet to identify. CHS 2 has been with BR on several occasions when he purchased quarter kilograms of heroin from CC and JR and was charged approximately $25,000.00 each transaction. More recently, on Monday December 29, 2015, CHS 2 was with BR and JR in the residence at 3973 Lowry Avenue discussing purchasing heroin. According to CHS 2, BR told JR that he has been paying approximately $25,000.00 for a quarter kilogram of heroin from CC, in which JR replied he would sell BR a quarter kilogram of heroin for $23,000.00. At that time, CHS 2 observed a quarter kilogram heroin transaction between BR and JR, and also observed JR place approximately one half kilogram of heroin into the refrigerator inside the kitchen. CHS 2 has personally observed BR utilizing TT#1 for the purpose of conducting narcotics related business, but is also aware that BR has two additional phones he uses when selling drugs.

16. Based on the aforementioned facts and reporting, I believe there is probable cause to show that BRIAN ROBINSON is using 513-903-8743 to commit federal narcotics offenses

and that the information requested will assist the FBI in identifying co-conspirators and additional cellular devices owned and operated by the targeted subjects.

## MANNER OF EXECUTION

17. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

18. To facilitate execution of this warrant, law enforcement may use an investigative device that sends signals to nearby cellular devices, including the Target Cellular Device, and in reply, the nearby cellular devices will broadcast signals that include their unique identifiers. The investigative device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell to communicate with others. Law enforcement will use this investigative device when they have reason to believe that BRIAN ROBINSON is present. Law enforcement will collect the identifiers emitted by cellular devices in the immediate vicinity of the Target Cellular Device when the subject is in multiple locations and/or multiple times at a common location and use this information to identify the Target Cellular Device, as only the Target Cellular Device's unique identifiers will be present in all or nearly all locations. Once investigators ascertain the identity of the Target Cellular Device, they will cease using the investigative technique. Because there is probable cause to determine the identity of the Target Cellular Device, there is probable cause to use the investigative technique described by the warrant to determine the identity of the Target Cellular Device.

19. The investigative device may interrupt cellular service of cellular devices within its immediate vicinity. Any service disruption will be brief and temporary, and all operations

will attempt to limit the interference cellular devices. Once law enforcement has identified the Target Cellular Device, it will delete all information concerning non-targeted cellular devices. Absent further order of the court, law enforcement will make no investigative use of information concerning non-targeted cellular devices other than distinguishing the Target Cellular Device from all other devices.

## AUTHORIZATION REQUEST

20. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

21. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days from the end of the period of authorized surveillance. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the person carrying the Target Cellular Device would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

22. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to identify the Target Cellular Device outside of daytime hours.

23. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These

9

documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

24. A search warrant may not be legally necessary to compel the investigative technique described herein. Nevertheless, I hereby submit this warrant application out of an abundance of caution.

Respectfully submitted,

Christopher M. Giordano
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this 6 day of January, 2016.

HONORABLE STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

This warrant authorizes the use of the electronic investigative technique described in Attachment B when the officers to whom it is directed have reason to believe that BRIAN ROBINSON is present.

## ATTACHMENT B

The "Target Cellular Device" is the cellular device or devices carried by BRIAN ROBINSON. Pursuant to an investigation of BRIAN ROBINSON for a violation of Title 21, United States Codes, 841(a)(1) and 846, this warrant authorizes the officers to whom it is directed to identify the Target Cellular Device by collecting radio signals, including the unique identifiers, emitted by the Target Cellular Device and other cellular devices in its vicinity for a period of thirty days, during all times of day and night.

Absent further order of a court, law enforcement will make no affirmative investigative use of any identifiers collected from cellular devices other than the Target Cellular Device, except to identify the Target Cellular Device and distinguish it from the other cellular devices. Once investigators ascertain the identity of the Target Cellular Device, they will end the collection, and any information collected concerning cellular devices other than the Target Cellular Device will be deleted.

This warrant does not authorize the interception of any telephone calls, text messages, or other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).